Roger P. Christensen, #0648
Roger.Christensen@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111-2048
Telephone: (801) 323-5000
Facsimile: (801) 355-3472

*Attorney for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH – CENTRAL DIVISION**

| | |
|---|---|
| PAUL A. CHRISTENSEN,<br><br>Plaintiff,<br><br>vs.<br><br>CHASE BANK, and Does 1-10<br><br>Defendants. | **FIRST AMENDED COMPLAINT**<br><br>(1) Breach of Contract<br>(2) Breach of the Covenant of Good Faith and Fair Dealing<br>(3) Negligence<br>(4) Negligent Misrepresentation<br><br>Civil No. 2:15-cv-00186-EJF |

As claims against Defendant, Plaintiff alleges as follows:

1. This is an action for damages brought by an individual for Defendant's breach of contract, breach of the implied covenant of good faith and fair dealing, Negligence, and Negligent Misrepresentation.

**<u>PARTIES</u>**

2. Plaintiff, Paul A. Christensen ("Christensen"), is an individual who resides in Saratoga Springs, Utah.

3. Defendant, Chase Bank, ("Chase") is a corporation headquartered outside the State of Utah doing business in Utah.

4. Plaintiff does not know the true names and capacities, whether corporate, partnership, association, individual or otherwise of Defendants sued as Does 1 through 10.

## GENERAL ALLEGATIONS

***Plaintiff Opened Bank and Credit Card Accounts with Defendant Based on Promises Made to Plaintiff of Defendant's Superior Services and Protections.***

5. On or about May 16, 2011, Plaintiff opened several bank accounts with Defendant, as well as applied for and received an "Ink" credit card. One particular transaction is the subject of this lawsuit.

6. Plaintiff opened these accounts at a Chase Bank branch location near Plaintiff's home in Saratoga Springs, Utah.

7. During the process, Plaintiff spent considerable time speaking with Defendant's Vice President, Randy Farnsworth and a "Small Business Specialist" Doug Marriottt.

8. Plaintiff explained to these individuals that based on his wife's former employment with Wells Fargo Bank, he had conducted his banking with Wells Fargo, but wanted to compare services between several banks.

9. These two individuals talked with Plaintiff, at length, about the benefits using Defendant over other financial institution, particularly Wells Fargo. For instance, Mr. Marriott and Mr. Farnsworth gave Plaintiff literature discussing Chase's "Better Banking Experience" and told Plaintiff that customer service and helping bank customers was their top priority, and that if Plaintiff ever had any problems on his accounts that he could simply come into the branch and the branch personnel would handle it.

10. In addition, Mr. Marriott and Mr. Farnsworth spoke with Plaintiff about various Chase credit cards, and encouraged him to open a credit card account with Defendant.

11. Plaintiff informed them that he already had a credit card with Wells Fargo, and that because his wife had previously worked at Wells Fargo, the card had enhanced fraud protection, and therefore he likely did not need a different credit card.

12. This led to Mr. Marriott and Mr. Farnsworth setting forth many of reasons why the Chase credit cards were superior to the Wells Fargo credit card. Specifically, they discussed the protections the Chase credit card had including the card's protection services that would provide superior protections to Plaintiff over his current card in the event of any fraudulent or unauthorized transactions.

13. Based on the representations in the literature as well as the specific discussions with Defendant, Plaintiff applied for and received a credit card that is now at issue in this case.

14. As part of this process, Plaintiff was provided a two-page document entitled "Ink Master Card, Effective 3-27-2011."

15. Since initiating this suit, Defendant has provided a document Defendant purports to be the credit card agreement between Plaintiff and Defendant. This document does not, however, contain any signatures.

16. Other than a two sentence provision related to Plaintiff's requirement to immediately inform Defendant if Plaintiff's credit card has been stolen, the agreement does not have express provision regarding the respective responsibilities of the parties in the event of stolen card or if unauthorized charges have been made to the card.

***Plaintiff Is Forced To Provide His Credit Card To A Local Scooter Rental Outfit On St. Maarten, Which Fraudulently Charged Him More Than $2,500 For A Scooter.***

17. From February 16, 2014, through February 23, 2014, Plaintiff and his wife were passengers on Carnival Cruise Lines' ship the Valor, which traveled and made various stops in the Virgin Islands.

18. On February 22, 2014, the ship stopped at the island of St. Maarten. After disembarking, Plaintiff and his wife, as well as another couple traveling with Plaintiff, rented motor scooters from a local merchant, Ras Links Rentals & Tours ("Ras").

19. Plaintiff paid sixty dollars ($60.00) in cash to rent the scooter for the day.

20. As part of renting the scooter, Plaintiff filled out a rental form where he provided his name, driver's license number, and the name of the cruise ship.

21. Plaintiff did not provide any credit card information to Ras.

22. Plaintiff was offered insurance for the scooter; however, the deductible was two thousand five hundred dollars ($2,500). After a discussion with Ras' owner, Plaintiff understood the scooter he was renting was not worth anywhere near the deductible amount, and therefore the only protection afforded by the insurance would be if an accident occurred with another vehicle whereby Plaintiff could be liable for damages to another vehicle or person. As a result, Plaintiff declined the insurance.

23. The owner gave Plaintiff a brief tutorial on how to operate the scooter.

24. Plaintiff, his wife, and the other couple, then departed the rental lot and proceeded to drive around the island.

25. Shortly after departing Ras, Plaintiff attempted to make a U-turn on the scooter, hit a patch of loose sand, and collided with the curb. Plaintiff did not sustain any significant injury; however, his wife cut to her hand, and appeared to need stitches.

26. A couple in a car witnessed the accident and stopped to help. The couple took Plaintiff's wife to a local hospital, while Plaintiff remained behind to take care of the scooter.

27. Prior to the departure for the hospital, Plaintiff unlocked the compartment under the seat of the scooter and removed his backpack, which he gave to his wife. He then relocked the compartment, and his wife and the others left for the hospital.

28. In assessing the minor damage to the scooter, Plaintiff and his friend determined that because the front wheel of the scooter was bent, it would not be safe to ride back to the rental shop. However, because the rental shop was rather close, he and his friend left the scooter where it was, and rode back to Ras together on the other scooter.

29. When Plaintiff got back to Ras, the owner was already aware Plaintiff had left the scooter down the road, and the owner had already dispatched an individual to pick up the scooter.

30. Plaintiff was asked to go into a room at the rental office, and told not to leave. At the same time, the owner asked two large male employees to stand inside the room by the door while the owner made several phone calls.

31. The owner also started to make statements attempting to inflate the value of the scooter. She asked what part had been damaged, and when Plaintiff told her it was the front wheel, she claimed front wheel damage on scooter is very expensive to fix.

32. Naturally, Plaintiff disputed these statements as the damage was minor, and as he and the owner had already discussed earlier, the scooter itself was not very valuable.

33. After a few minutes, the owner received a phone call, which resulted in her claiming the scooter had been stolen. The owner claimed that despite the fact she already knew where the scooter was, and that a friend had been watching it, that when the individual who had gone to retrieve it arrived, the scooter had somehow disappeared.

34. The owner claimed the only thing found at the location where the scooter had been was a small padlock that used to lock up the brake pad of the front wheel.

35. Plaintiff did not believe Ras' statements, particularly because when he left the scooter, the small padlock that was allegedly found on the road had been locked inside the lockable compartment under the scooter's seat, and Plaintiff had the key.

36. Plaintiff attempted to point out to the owner that the only plausible explanation for the employee having the padlock in his possession was that he had removed it from the locked compartment under the seat of the scooter. Also, it was inconceivable that the person(s) who allegedly stole the scooter had taken the time to break open the locked compartment under the seat, removed the padlock, and then left it on the side of the road.

37. Around this same time, the employee who was sent to pick up the scooter returned. Plaintiff then questioned the employee about these discrepancies. The employee became very upset and made several threats about beating Plaintiff up for questioning him. The employee then slammed the padlock down on the table in front of Plaintiff and told him he "would kick [Plaintiff's] fucking bitch ass" if Plaintiff continued to question him.

38. Plaintiff felt very threatened. Notwithstanding, Plaintiff did not give up contesting the alleged disappearance of the scooter in the hope that doing so would demonstrated to the owner that the employee was lying.

39. In response, the employee changed his story and claimed a group of construction workers had witnessed the accident and had given him the lock after the workers had found it on the ground.

40. Plaintiff then questioned the employee as to how the construction workers could have seen the accident, came over and found the padlock, were observant enough to then see the employee looking for the "missing" scooter, and given him the padlock, *but* somehow did not see the individuals that allegedly took the scooter.[1]

41. Plaintiff's questioning did not dissuade the owner, or the employee. Instead, they both became very hostile. The owner then asked the employee to wait outside the door. On his way out the employee reiterated his intent to "kick [Plaintiff's] fucking ass!"

42. Unfortunately, it became clear to Plaintiff that all of this was a ruse to extort money from him.

43. Undaunted by the clear lack of credibility of the employee's claims, the owner insisted Plaintiff pay over two thousand five hundred dollars ($2,500.00) for the scooter.

44. Plaintiff refused.

45. Plaintiff told the owner he was willing to pay to fix the front wheel (which for a Chinese made scooter should have been no more than a couple hundred dollars), but that Plaintiff was not going to pay for a scooter that was clearly not stolen, and was certainly not worth more than $2,500.

[1] Plaintiff has subsequently learned from various sources, including a local news reporter, Mike Granger, that it is well known on St. Maarten that the rental shops employ various individuals to "steal" rentals on the island to then defraud tourists.

46. Plaintiff then demanded the police be called, and a formal report be written up on the matter.

47. The owner refused.

48. She also refused to let Plaintiff use the phone for any other purpose.

49. To make matters worse, the owner made it clear that Plaintiff was not going to be allowed to leave the room he was in, nor would he be allowed to use the telephone without paying Ras the extortion fee.

50. Plaintiff was trapped.

51. He knew that unless he complied with the owner's demands he would likely be physically harmed by either the two large males still in the room and/or the abusive employee.

52. It became clear to Plaintiff that: (a) the owner was not going to be reasonable; (b) without a cell phone Plaintiff had no way to contact anyone, including the local police; (c) if he tried to leave without paying the owner's demand, the two large male employees and/or the other employee would physically assault him; (d) if he kept arguing, he would likely be assaulted; and (e) given the time of day, there was a real possibility the cruise ship would depart without him, and he would be stranded on the island with no way of contacting his wife or getting back on the ship.

53. As a result, Plaintiff had no choice but to hand over his credit card.

54. Hoping to thwart the process, Plaintiff initially gave Ras a credit card issued by Wells Fargo Bank, because it had a more sensitive fraud protection. This tactic worked too well as the credit card machine stated the cardholder needed to call the bank to verify the purchase.

55. Ironically, the owner was now more than willing to let Plaintiff use the phone. However, Plaintiff did *not* agree with anything that was occurring, and therefore refused to call Wells Fargo and verify the transaction over the phone.

56. This lead to more disagreement, but nothing changed. The owner was not going to allow Plaintiff to leave without paying for the scooter.

57. Plaintiff was then compelled to give the owner his credit card issued by Defendant.

58. Plaintiff did not willingly do so. Indeed, he only provided his card because of the clear threat of harm he was faced with. Plaintiff refused to sign the credit card receipt, and surprisingly, the owner did not force him to do so.

59. After giving Plaintiff a completely bogus invoice for the scooter, Ras allowed Plaintiff to leave.

60. Upon returning to the cruise ship, Plaintiff spoke with the ship's security, but was informed the cruise line would not help. The Valor then departed the island.

***Plaintiff Immediately Informed Chase of the Fraudulent Activity Upon His Return, and Was Assured That The Matter Would Be Taken Care of and That He Would Not Be Charged.***

61. On February 24, 2014, (the morning after his return) Plaintiff went to his local Chase branch seeking help with the fraudulent charges.

62. After explaining what happened to Defendant's employee, Lindi Nielsen, Plaintiff was assured the matter would be taken care of and that the charge would be removed.

63. He and Ms. Nielsen discussed the issue at length, and Plaintiff informed Ms. Nielsen that he was relying on her to help him, as he was unfamiliar with the process of how report the

fraudulent activity. Plaintiff asked Ms. Nielsen if he needed to file any paper work or take any steps independent of her to help the process.

64. Ms. Nielsen informed Plaintiff that he did not need to take any other steps until she contacted him, and that "she would handle things" for him.

65. Later that day, Ms. Nielsen informed Plaintiff that she had spoken with multiple individuals within Chase, and that Plaintiff needed to file a police report with the local police in Saratoga Springs, Utah. Ms. Nielsen indicated that doing so would help ensure the fraudulent charges would be removed.

66. Based on Ms. Nielsen's direction, Plaintiff filed a police report with the local police department that day.

67. Plaintiff provided a copy of the Police Report to Ms. Nielsen on February 27, 2014.

68. A few days later, Ms. Nielsen telephoned Plaintiff to inform him that the matter had been taken care of, and that his account would be credited, and that he did not need to take any further steps.

69. About a month later, Plaintiff's account was credited, and he believed the matter to be closed.

***Defendant Failed To Adequately Investigate Plaintiff's Claim, and Determined to Re-Charge Plaintiff's Account.***

70. On or about June 23, 2014, Plaintiff received a call from an individual in Defendant's fraud department. Defendant's representative stated that the owner of Ras had provided a statement as well as several documents, allegedly supporting the contention that Plaintiff had willingly agreed to the charge.

71. Despite having never spoken with Plaintiff, or allowing him to review the documents that purportedly supported Ras' claim, Defendant informed Plaintiff it would place the charge back on his credit card account.

72. Defendant stated that because Plaintiff had "voluntarily" given his card to Ras he had "authorized" the transaction.

73. Defendant took this position despite the fact that Plaintiff was forced to provide his credit card to Ras under threat of serious bodily harm and/or being held to the point where he would have been stranded on the island.

74. Plaintiff requested to speak with a supervisor.

75. After discussing the situation with Plaintiff, the supervisor assured Plaintiff that Defendant would: (1) email Plaintiff all of the documentation Defendant had collected from Ras allegedly supporting the claim within the next five business days; (2) not charge Plaintiff's account without discussing the matter with Plaintiff; and (3) allow Plaintiff an opportunity provide his own account of the incident including statements from witnesses who were present.

76. Defendant did not live up to its promises.

77. That same day, Plaintiff contacted Ms. Nielsen and asked her to help him and ensure that Defendant honored the commitment that had been made.

78. Ms. Nielsen assured Plaintiff she would do so.

79. Plaintiff never received the documents as promised, and no other actions were taken for several weeks.

80. Based on this, Plaintiff assumed Ms. Nielsen had taken care of the matter.

81. This was not the case.

82. On or around July 24, 2014, Plaintiff received a voicemail message from the supervisor asking him to return her call at his convenience.

83. However, prior his being able to return the call, the $2,550 charge was placed back on his account.

84. When Plaintiff attempted to call Defendant's fraud department the telephone extension provided to him did not work. An automated system instructed him to contact Defendant through a different toll free number.

85. Rather than deal with someone completely unfamiliar with the situation, Plaintiff again contacted Ms. Nielsen, who again assured him she would take care of the situation.

86. Unfortunately, Ms. Nielsen has failed to do so.

87. On or about August 15, 2014, a co-worker of Ms. Nielsen called Plaintiff and informed him that despite the fact Defendant never gave Plaintiff an opportunity to dispute any of the items Defendant claimed were used to determine the fraudulent charges had been authorized, Defendant would not reverse the charges and that Plaintiff's only course of action would be to work with his local police department to try and get Ras to give him is money back.

88. In breach of its duties to Plaintiff as well as in violation of applicable law, Defendant is now making demands for payment on the fraudulent charge.

## CLAIM I
## BREACH OF CONTRACT
## (Against Defendant and Does 1 through 10)

89. The other allegations of this Complaint are realleged and incorporated by reference herein.

90. Defendant and Plaintiff have a contractual agreement between them related to the credit card at issue in this matter.

91. The contractual relationship between the parties a duty to investigate allegations of fraudulent charges with reasonable thoroughness, diligence and fairness.

92. Defendant also had and has a duty to remove charges, which a reasonable investigation reveals to be fraudulent from Plaintiff's account.

93. Had Defendant conducted a proper investigation, it would not have placed the fraudulent charges back on Plaintiff's account.

94. Defendant has breach its contractual duties under the agreement between the parties by attempting to collect on a transaction, which Defendant knows to be fraudulent.

95. As a result, Plaintiff has been damaged, and continues to be damaged, and is entitled to judgment against defendant as set forth hereafter.

## CLAIM II
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (Against Defendant and Does 1 through 10)

96. The other allegations of this Complaint are realleged and incorporated by reference herein.

97. All contracts include an implied covenant that the parties will act fairly and in good faith in their dealings with the other party.

98. Defendant has breached its duty to treat plaintiff fairly and to act in good faith.

99. As a result, Plaintiff has been damaged, and continues to be damaged, and is entitled to judgment against defendant as set forth hereafter.

**CLAIM III**
**NEGLIGENCE**
**(Against Defendant and Does 1 through 10)**

100. The other allegations of this Complaint are realleged and incorporated by reference herein.

101. Defendant has a duty to act with reasonable care to protect Plaintiff from being charged for items Plaintiff did not lawfully authorize, and/or agree to, including but not limited to the duty to reasonably investigate fraudulent activity reported by Plaintiff on his account.

102. Defendant has breached this duty by failing to reasonably investigate the fraudulent activity at issue in this matter.

103. As a result, Plaintiff has been damaged, and continues to be damaged, and is entitled to judgment against defendant as set forth hereafter.

**CLAIM IV**
**NEGLIGENT MISREPRENTATION AND ESTOPPEL**
**(Against Defendant and Does 1 through 10)**

104. The other allegations of this Complaint are realleged and incorporated by reference herein.

105. Defendant made misrepresentation to Plaintiff about the protections Defendant would provide to Plaintiff in the event of unauthorized and/or fraudulent activities related to the credit card, which Defendant knew or should have known were untrue at the time they were made, and Defendant had a financial interest in Plaintiff using its credit card services.

106. Plaintiff relied on these representation is applying for and subsequently using the credit card. Plaintiff further relied on these promises after the fraudulent conduct related to the card occurred. Further, Defendant is estopped from honoring such representations.

107. Defendant is liable for damages suffered by Plaintiff based on its negligent misrepresentations. In addition, Defendant should be estopped from avoiding such representation and should be required to perform as represented. Plaintiff has been damaged, and continues to be damaged, and is entitled to judgment against defendant as set forth hereafter.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

a. For an amount representing the full fair value of the damages which Plaintiff has incurred, or will incur, as a result Defendant's breaches as well as its violations of federal law.

b. Litigation expenses and reasonable attorney's fees; and

c. For interest, costs, and such further relief as provided by law or equity.

DATED this 7th day of May 2015.

CHRISTENSEN & JENSEN, P.C.

/s/ Roger P. Christensen
Roger P. Christensen
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of May, 2015, a true and correct copy of the foregoing **FIRST AMENDED COMPLAINT** was delivered via the court's electronic filing system to the following:

Stephen C. Tingey
Elaina M. Maragakis
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
PO Box 45385
Salt Lake City, Utah 84145-0385

Anne L. MacLeod